SAMUEL DAVIS, DEFENDANT IN ERROR, v. THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, PLAINTIFF IN ERROR.

Argued March 14, 1902—Decided June 16, 1902.

A light, one-horse wagon, in which the plaintiff sat, had been driven by another man, over whom the plaintiff had no authority, along a public highway in a southerly direction over a single-track railroad crossing, when its progress was arrested by the lowering of gates that were designed to guard the crossing on that side. The horse and the wagon and its occupants were thus penned in between the gates, some six or eight feet in front of the horse, and the track, the nearer rail of which was about ten feet back of the hind wheels of the wagon. The gates were operated by a man in a tower about two hundred and sixty feet distant. The plaintiff and the driver shouted to the man in the tower to raise

the gates. A trolley car came along the highway from the south and stopped on the other side of the gates. The plaintiff and the driver continued to sit in the wagon. The gates were not raised. After an interval, estimated by the plaintiff at one minute and a half, a train came from the northeast at the rate of about thirty miles an hour, and the horse, becoming frightened, backed the wagon against the engine and the plaintiff was injured. *Held*, that it was for the jury to say whether the plaintiff was negligent in not alighting from the wagon.

In tort. On error to the Supreme Court.

For the plaintiff in error, *Richard V. Lindabury.*

For the defendant in error, *Edmund Wilson.*

The opinion of the court was delivered by

ADAMS, J. The plaintiff, while traveling on a public highway, was hurt by a railroad train. He sued the railroad company to recover compensation for his injury and obtained a judgment, which is now to be reviewed. The single error alleged on the argument is that the trial judge submitted to the jury the question of contributory negligence.

This ruling was correct. The plaintiff, without fault of his own, was suddenly and unexpectedly placed in a predicament. The danger that threatened him was known and imminent. He had a choice of several lines of conduct, and chose one of them. The jury might fairly conclude that he acted with ordinary prudence. This question was for them, and not for the trial judge.

The essential facts of the situation are these: The plaintiff was riding, in a light wagon, by daylight, along Second avenue, in Long Branch. A Mr. Lane was driving the horse. The plaintiff had no control of Mr. Lane and no responsibility for the management of the horse. Second avenue runs about north and south, and is crossed diagonally by a single track of the defendant's railroad, which runs northeasterly and southwesterly. Each side of this crossing is guarded by gates. The northerly gates are distant about three hundred

and sixty feet from the southerly gates. Other gates guard another street. All these gates are operated by a man in a tower. It does not appear whether the different pairs of gates can be operated separately.

Mr. Lane was driving south along Second avenue, on the right-hand or west side of the road. The northerly gates were up. He passed them, drove at a slow trot to a point near the track and walked his horse over the crossing. The plaintiff, who sat on the left side of the wagon, looked along the track in a northeasterly direction and saw and heard no train. Still going at a walk, the horse approached the southerly gates, which were up. When the horse's head was eight or ten feet from the gates they were lowered. This brought the wagon to a standstill, with its hind wheels about ten feet away from the nearer rail. Up to this point no negligence is imputed to the plaintiff. Both Mr. Lane and the plaintiff shouted to the man in the tower, who was about two hundred and sixty feet distant from them, and somewhat behind them, to raise the gates. A trolley car came from the south to the other side of the gates and stopped. The man in the tower did not raise the gates. The plaintiff and Mr. Lane remained sitting in the wagon. A train came from the northeast. The testimony of the engineer as to his time schedule indicates a speed of about thirty miles an hour. The horse got frightened and backed the wagon against the engine, and the plaintiff was injured.

The element of time is material. The plaintiff was asked, "From the time you stopped at the gate until the train came, how long was it?" He answered, "I should think it was a minute and a half." The following extracts from his testimony afford measures of time.

"*Q.* How long had the horse been standing there before you noticed the approach of the trolley car from the south?

"*A.* It was on its way when we first stopped.

"*Q.* Did you really notice that car at all, coming from that direction?

"*A.* Yes, sir.

"*Q.* When you first stopped?

"*A.* Yes, sir.

"*Q.* How far off was it then?

"*A.* It was pretty well down, towards the West End.

"*Q.* How far do you say?

"*A.* I don't know.

"*Q.* Half a mile?

"*A.* Half a mile, perhaps.

"*Q.* Did it get to that gate before the railroad train got there?

"*A.* Just about one time, as near as I can tell.

"*Q.* It had stopped before the railroad train got there?

"*A.* Just about stopped; it hadn't any more than stopped.

"*Q.* And the gates were down?

"*A.* The gates were down.

\* \* · \* \* \* \* \* \* \* \* \* \*

"*Q.* Did this engine ring its bell or blow its whistle?

· "*A.* No, sir; if it did, I didn't hear it.

"*Q.* Did you hear the train approaching just before you were hit?

"*A.* Yes, sir; just a minute.

"*Q.* How long an interval was it between the time when you heard the roar of the train and the time when you were hit?

"*A.* Not over a second or so.

"*Q.* From the time you heard the train until you were hit?

"*A.* It was not over a second or so, and about the time I saw it we were struck.

"*Q.* After you heard the train, did you have any chance to get out of the wagon before you were hit?

"*A.* No, sir."

It further appears that the plaintiff knew that he was in a place of danger; that, as he sat in the wagon after its progress had been arrested, he looked both ways on the railroad track; that he could see a long distance to the southwest, and that no train was approaching from that quarter; and that he could not see far to the northeast. The engineer testified that he rang the bell and blew the whistle.

· It cannot be said that the length of time between the

stoppage and the accident is precisely fixed. Estimates of the duration of short periods into which much experience is crowded are notoriously inexact, and are apt to be excessive. The distance traversed by the trolley car is loosely stated. There is no proof as to its rate of speed. The fair conclusion seems to be that there was an interval, short but appreciable, between the descent of the gates and the arrival of the train. The plaintiff undoubtedly had time to alight. It is said, and this is the sole criticism of his conduct, that he was negligent in not doing so.

To one who now, at a safe distance, exercises, in the light of subsequent events, the easy function of review, it seems that several courses of action were open to the plaintiff. It is to be observed that he was in a place where injury was not inevitable. If the horse would stand still, the wagon and its occupants would be safe. The plaintiff testified that he had known the horse for several years, and that he was kind. To remain in the wagon, on the chance that the horse would be steady, was therefore a line of conduct which, if not wholly wise, would not have been irrational. Again, it was surely reasonable to think, at least at the outset, that the man in the tower would hear the call upon him, and to expect, or at least to hope, that, if he heard it, he would raise the gates. Again, the plaintiff might have jumped off and run away, and left Mr. Lane to get out of trouble as he best could. A man of spirit and self-respect would not be apt to do this, as long as he might be of use to his companion. Again, the plaintiff might have alighted and held the horse's head. Such an intervention, in a moment of peril, by a person with whose presence a horse is not familiar, is apt to irritate the horse and embarrass the driver, if not to injure him who intervenes. A more judicious plan would probably have been for Mr. Lane to hand the reins to the plaintiff and to go to the horse's head himself.

It is unnecessary to pursue the subject. Enough has been said to indicate the ground of our conclusion. The exigency was sudden, the risk alarming, the best way of escape not

obvious. We think that whether the plaintiff acted with common prudence was a fair question for the jury. The judgment is affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DIXON, GARRISON, COLLINS, GARRETSON, HENDRICKSON, PITNEY, ADAMS, VREDENBURGH, VROOM. 11.

*For reversal*—None.